■ RENEE TANGO et al., Respondents-Appellants, v JENNIE TULEVECH, Individually and as an Employee of the Rockland County Department of Probation, et al., Appellants-Respondents. — In an action to recover damages, *inter alia,* for negligent interference with custodial rights, the parties cross-appeal from a judgment of the Supreme Court, Rockland County (Ruskin, J.), entered November 18, 1981, which was in favor of the plaintiffs, after a jury trial.

Judgment reversed, on the law, without costs or disbursements, and complaint dismissed. Plaintiff Charles Tango and Barbara Childs were divorced in New Jersey in 1974. The divorce judgment awarded Ms. Childs permanent custody of the parties' children, infant plaintiffs Renee and Ruth Tango. In February, 1977, in the course of a support proceeding commenced in New Jersey by Ms. Childs, she and Tango, aided by the Union County Probation Service, entered into a letter agreement by which Childs relinquished custody of the children to Tango for a period of one year beginning February 18, 1977. The children were to reside with Tango in Rockland County, New York, and he was to be relieved of his support obligations for the one-year period. The agreement provided further that Childs was to have the right to visit the children at least once a month. Thereafter, on June 29, 1977, the Juvenile and Domestic Relations Court of Union County dismissed Ms. Childs' support proceeding without prejudice. In its order, the court noted that "[t]he Probation Department [had] in its possession a letter signed by [Ms. Childs] wherein it is stated that both parties have an agreement modifying the divorce decree as it pertains to the two children, Ruth and Renee, who are subject to the support order and [that Ms. Childs had] indicated, in a telephone conversation, that she wishes to dismiss the * * * matter". In August, 1977, after Ruth and Renee had moved in with their father and had registered in a Spring Valley school, he commenced a proceeding in the Supreme Court, Rockland County, seeking permanent custody of the children. Shortly thereafter, Robin Alvarez commenced a separate proceeding in the Family Court, Rockland County, seeking an order granting her visitation rights with her younger sisters, Ruth and Renee. It was in connection with this Family Court proceeding that Tango first came into contact with defendant Jennie Tulevech who was employed as a supervisor of the In-Take Unit of the Rockland County Probation Department, assigned to the Family Court. In a telephone conversation, Tango told Tulevech that he opposed visitation rights for Ms. Alvarez because he was afraid that she would take the children "off someplace". The action at bar arose out of an incident which occurred on October 31, 1977, and which began when Ruth and Renee arrived at school. As the children exited from their schoolbus, Barbara Childs and Robin Alvarez seized them and pulled them into a car in which Childs' husband was waiting. The principal of the school saw the abduction and notified the police, giving them the license plate number of the vehicle. The police subsequently intercepted the car and brought its occupants to the In-Take Unit of the Rockland County Family Court. There they encountered defendant Tulevech. The ensuing events were in some dispute at trial. Ms. Tulevech conceded that she was told that Childs had taken the children from the school grounds and was planning to take them to her home in South Carolina. Childs produced the divorce decree awarding her custody of the children, and also produced the letter agreement which, Ms. Tulevech noted, had not been notarized. Ms. Tulevech then examined the children and concluded that they "looked well cared for, they looked well". Thereafter, Charles Tango appeared, accompanied by a law student employed by his attorney. They told Ms. Tulevech of the pending Supreme Court custody proceeding, and she also became aware that the support proceeding in New Jersey had been dismissed with Ms. Childs' consent. Ms. Tulevech testified, however, that she had not been shown the actual order dismissing the proceeding and she categorically denied that anyone had ever told her that Barbara Childs had abused the children while they were in her custody. Essentially, Ms. Tulevech took the position at trial that she had acted only as a mediator in the dispute. She claimed that she had told Charles Tango that his former wife was going to take the children and that Mr. Tango accepted that fact although he was upset

over the prospect of the children going to South Carolina. When Mr. Tango asked to say goodbye to the children, Tulevech, at Childs' request, asked a deputy Sheriff to stand by in the event of any disturbance. Tulevech suggested to Tango that he file a petition for custody in the South Carolina courts. The version offered by the plaintiffs' witnesses was somewhat different. According to them, Ms. Tulevech supported Ms. Childs' claim of possession of the children based upon her right to custody under the divorce decree. Tango claimed that he told Ms. Tulevech that Childs had abused the children but that Tulevech simply replied that she could not detain the mother and children any longer. Further, according to plaintiffs' witnesses, Ms. Tulevech refused to permit Mr. Tango to speak to her supervisor and, when he asked to speak to a Judge, she told him that all the Judges were busy. She suggested that he get an attorney. Ms. Tulevech then instructed a police officer to escort Ms. Childs and her entourage out. It was also claimed by the plaintiffs' witnesses that Ms. Tulevech was shown a copy of the New Jersey order of June 29, 1977 but adhered to her opinion that Ms. Childs had custody of the children and that the Probation Department had no authority to keep them from her. Ms. Childs ultimately took the children to South Carolina, and it is claimed that, while in her custody, they were mistreated. Tango thereafter made strenuous efforts to locate his children and, ultimately, on June 19, 1978, in South Carolina, he was awarded custody. This action was subsequently commenced, *inter alia,* to recover damages allegedly sustained by reason of the defendants' interference with Mr. Tango's custodial rights. The jury ultimately returned a verdict in favor of the plaintiffs. We conclude that under no view of the evidence can Ms. Tulevech or the County of Rockland as her employer, be cast in damages. Accordingly, we reverse and dismiss the complaint. In *Rottkamp v Young* (21 AD2d 373, affd 15 NY2d 831), the plaintiffs applied for a permit for the erection of a diner on certain premises. Their application was denied by the defendant building inspector, and thereafter by the town board. The plaintiffs challenged the denial in an article 78 proceeding, and Special Term directed that the building permit be issued. While an appeal was pending, the town amended its zoning ordinance to exclude a diner as a permitted use on the premises. The Appellate Division thereafter held that, although the plaintiffs had been entitled to issuance of the permit as a matter of right when they applied for it, they were no longer so entitled in view of the amended ordinance. Applying the law as it existed at the time of the appeal, the Appellate Division reversed Special Term's order which had directed the issuance of the permit. The plaintiff thereupon instituted an action against the building inspector and the town, alleging in essence that the wrongful denial of the permit was intentionally designed to stall the plaintiffs until an amended zoning ordinance could be enacted. This court ordered the dismissal of the plaintiffs' complaint observing, in an opinion by Justice Hopkins, as follows (21 AD2d 373, 375-376): "In 1883 the Court of Appeals considered the rule to be well settled that 'no public officer is responsible in a civil suit for a judicial determination, however erroneous or wrong it may be, or however malicious even the motive which produced it' * * * The rule, as expressed, has a long and respected vintage * * * Under the rule a distinction is drawn between a ministerial or nondiscretionary act from which liability ensues if done wrongfully, and a judicial or discretionary act for which the public officer is immune from liability even if the act is wrongful * * * Though the rule has been criticized, we think that sound reasons of public policy underlie it. To fasten responsibility for damages on a public officer for the exercise of judgment or discretion in favor of one disappointed by the result 'would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching

discharge of their duties' * * * In weighing the balance between the effects of oppressive official action and vindictive or retaliatory damage suits against the officer, we think that the public interest in prompt and fearless determinations by the officer, based on his interpretation of the law and the facts before him, must take precedence. A public officer, haunted by the specter of a lawsuit, may well be subject to the twin tendencies of procrastination and compromise to the detriment of the proper performance of his duties * * * We need not distinguish with precision the character and quality of the act which marks it as discretionary rather than ministerial. Each case must be decided on the circumstances involved, the nature of the duty, the degree of responsibility resting on the officer, and his position in the municipality's table of organization. It must still be true that discretion is indicated if the powers are 'to be executed or withheld according to his own view of what is necessary and proper' * * * We think that the action of the [building inspector] in determining, albeit erroneously, that the plaintiffs were not entitled to a building permit for the erection of a diner, was discretionary and quasi-judicial in character. This determination necessarily involved the construction of the zoning ordinance and a consideration of the facts before him — an act which a building inspector must perform as part of his responsibilities". In the case at bar, the plaintiffs' claim rested largely on the contention that Ms. Tulevech had "deviated from acceptable professional practice in New York" and should have referred the matter to a Family Court Judge. Nevertheless, a serious question was presented as to whether the Family Court in fact had jurisdiction over the question of custody in view of the custody proceeding then pending in the Supreme Court, Rockland County (see, e.g., Family Ct Act, § 651). Nor was there any showing at trial that Ms. Tulevech had actually violated any duty or obligation imposed upon her by statute or rule governing the conduct of the Probation Department. Moreover, although allegations were made regarding abuse of the children, Ms. Tulevech found no evidence of such abuse in her examination of Renee and Ruth. And the only unequivocal legal document she had before her was the parties' divorce decree which granted custody to Ms. Childs. To now hold that Ms. Tulevech may be cast in damages for failing to disregard that court order and restrain the children and their mother would plainly be to discourage the sort of prompt and fearless determinations that public officers are called upon to make (see *Rottkamp v Young, supra;* cf. *Teddy's Drive In v Cohen,* 47 NY2d 79). In our view, the evidence demonstrates that Ms. Tulevech exercised her discretion in good faith as she saw fit based upon her interpretation of the law and the facts presented to her. That she may have acted unwisely, or that a better course was open to her, cannot serve to deprive her of the immunity which the public interest demands. Mollen, P. J., Titone, Weinstein and Rubin, JJ., concur.